IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MATTIE R. AVERY,                               )
                                               )
  Plaintiff,                         )
                                               )
v.                                             ) CIVIL ACTION NO. 2:15-CV-239-WHA
                                               ) (WO)
ALABAMA STATE UNIVERSITY                        )
& ALEX PETTWAY,                                )
                                               )
  Defendants.                        )

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment, (Doc. # 39), and accompanying brief in support, (Doc. # 39-1), filed by Defendants Alabama State University ("ASU") and Alex Pettway ("Pettway").

The Plaintiff, Mattie Avery ("Avery") filed a Complaint in this case on April 10, 2015, alleging violations of federal and state law. Specifically, Avery makes six (6) claims, including sexual harassment and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended (Count One); retaliation (Count Two); discrimination pursuant to the Americans with Disabilities Act ("ADA") and the Americans with Disabilities Act Amendments ("ADAA") (Count Three); invasion of privacy (Count Four); negligent hiring, supervision, training, and retention (Count Five); and the tort of outrage (Count Six). (Doc. # 1).[1]

For reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

---

[1] Avery concedes that her state law claims in Counts Four, Five, and Six are due to be dismissed on immunity and statute of limitations grounds. (Doc. # 45, p. 27, n. 12). Accordingly, these claims are due to be Dismissed. The remainder of this opinion will address Avery's federal claims for sex discrimination and retaliation under Title VII and disability discrimination under the ADA.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be" and a party asserting that a fact "is genuinely disputed" must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B). Acceptable materials under Rule 56(c)(1)(A) include: "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III.   FACTS

The submissions of the parties establish the following facts, construed in the light most favorable to the non-movant:

Plaintiff Mattie Avery, a female, began working for Defendant ASU as a police officer on January 6, 2013. As a new employee, Avery was required to complete a twelve-month probationary training period.

The ASU Human Resources Policies and Procedures Manual ("HR Manual") states that "[a] twelve month probationary period shall be required of all employees appointed or promoted to classified positions." (Doc. # 44-8, p. 26, Section 2.5.2). The Manual further defines a probationary employee as "[a] full-time employee who is appointed to the University to fill a classified position or who is promoted from within the University to fill a classified position who has not completed the required term of continuous and satisfactory service in the position that is necessary to advance beyond probationary status." (Doc. # 44-8, p. 20, Section 1.2.2). Moreover, "[t]he University reserves the right to terminate the employment of a probationary employee at any time during or at the end of the probationary period." (Doc. # 44-8, p. 26, Section 2.5.2). However, to terminate a probationary employee, a recommendation for termination of employment must be approved by the President of ASU. (Doc. 39-32, pp. 46:20–47:2).

When Avery was hired, she was placed on second shift and Corporal Stoney Davis ("Davis") was her supervisor. As part of her training, Davis assigned Avery to ride along with various officers who would take her to different geographic "Zones" around ASU's campus and explain what needed to be done to secure those areas. Afterwards, Davis would provide feedback

to Avery regarding her performance. (Doc. # 39-10, p. 73:9–73:16).

One of the officers who worked the second shift was Defendant Officer Alex Pettway, a male. Avery had previously been acquainted with Pettway, because, when Avery was hired, Pettway invited her to move in with him. (Doc. # 1, p. 4, ¶ 14(c)). In her deposition, Avery stated that Pettway's invitation was merely a collegial one, because "[Pettway] was under the impression that [Avery] didn't . . . have a place to stay in [Montgomery]." (Doc. 39-10, p. 217:3–217:11).

On March 19, 2013, Davis assigned Pettway to train Avery. (Doc. # 45, p. 3). On that day, Pettway allegedly made several comments of a sexual nature towards Avery. While driving past two females on campus, Pettway allegedly remarked that "the females looked good and he did not mind getting with them." (Doc. # 39-13, p. 1). Later, Pettway pulled out his cell phone and started scrolling through a list of names, stating "he had fucked this one and that one." *Id.* Then, as Pettway and Avery were driving around campus, Pettway saw several females walking on the sidewalk and commented "dam [sic] she's fine, the one with the purple shorts, with the long legs on the outside. I wouldn't mind hooking up with her. The other one don't look bad either." (Doc. 39-14, p. 1). Pettway also told Avery about a girl he had previously had sex with, and told her that he "only wanted sex from her then he dropped her." *Id.* Additionally, Pettway made Avery aware that he had previously been accused of sexual harassment while employed by the Montgomery Police Department. (Doc. # 39-13, p. 1). During the entire shift, Pettway continued talking about sex and girls.[2]  (Doc. # 45, p. 4).

_____

[2]  Avery contends that Pettway was assigned to train Avery on at least four (4) separate occasions. (Doc. # 39-10, pp. 91:5–93:17). Although Avery does not remember the exact timeline, she contends that on at least one other occasion—perhaps even on the same day that Pettway allegedly made the other sexual remarks—Pettway parked their patrol car under a tree and told Avery about a woman he had previously had sex with while working for the Department of Corrections. (Doc. # 39-10, p. 215:6–216:1). Avery did not complain about this incident to her superiors, (Doc. # 39-10,

Pettway then made two sexual advances towards Avery. That evening, while Pettway and Avery were performing routine building checks in "Zone 1" on ASU's campus, Pettway allegedly stated, "dam [sic] you look good," (Doc. # 39-14, p.1), and asked, "can I fuck you on the couch?" (Doc. # 39-13, p.1). Avery was, at first, confused but responded unequivocally, "no." *Id*. Seemingly undeterred, Pettway asked again, "can I fuck you on the couch?" (Doc. # 39-13, p. 1). At that point, Avery became "nervous, concerned and angry," and "again responded 'no.'" *Id*. Avery considered reporting Pettway at some point during the shift, but, because she "was afraid if [she] reported [the incident while] on the shift[,] it would have been told back to officer Pettway what [she] stated about him," she finished the shift without reporting the incident. (Doc. # 39-18, pp. 2–3).

The next day, Avery complained to Officer Franklin Wiggins ("Officer Wiggins") that Pettway had sexually harassed her. (Doc. # 39-13, p. 1). Wiggins relayed Avery's complaint to Captain Tony Simmons ("Captain Simmons") and Chief James Graboys ("Chief Graboys"). Chief Graboys instructed Avery to submit a formal complaint in writing. Avery submitted her written complaint two days later on March 22, 2013.[3] Also on March 22, 2013, Captain Simmons and Chief Graboys met with Avery to discuss the incident and encouraged her to file a formal complaint with ASU's Office of Human Resources, pursuant to ASU policy.

Chief Graboys then immediately moved Avery from second shift to first shift so that she

---

p. 80:21–80:23), and does not argue in her Response to Defendants' Motion for Summary Judgment that this incident had anything to do with the sexual harassment at issue in this case.

[3] Although it is unclear from Avery's deposition, it appears that Avery first spoke to Officer Wiggins *via* phone-call about the alleged incident giving rise to this complaint, which was on the day after it occurred—March 20, 2013—her day off. Avery does not remember if she had another off-day on March 21, 2013, but assumes she did. Therefore, it is at least a reasonable inference that Avery submitted a written complaint regarding Pettway during her next shift at ASU. (Doc. # 39-10, pp. 137:11–138:23).

would not have to come into contact with Pettway and so that she could complete her training. As part of the move from second shift to first, Avery requested to be trained by Officer Wiggins, who was the certified training officer on the first shift. (Doc. # 39-10, p. 251:3–251:6). Chief Graboys agreed and Officer Wiggins became her primary training supervisor. Even though Avery allegedly came into contact with Pettway two more times—once at a police department cookout where Pettway allegedly stared at her from across the room and another time at a shift change, (Doc. # 39-18, p. 3)—Avery was satisfied with these changes to her schedule and her training. (Doc. # 39-13, p. 2).

On April 3, 2013, Avery filed a formal complaint with ASU's Office of Human Resources. In her complaint, Avery complained about Pettway's multiple sexual advances on March 19, 2013 and the two subsequent incidents in which she ran into Pettway. (Doc. # 39-18, pp. 2–3). In addition, Avery submitted an affidavit on April 5, 2013, in which she repeated her complaint about Pettway's comments about other women, his two requests to have sex with her, and the incident in which she ran into Pettway at the police department cookout. (Doc. # 39-13, p. 1–2). However, after conducting a formal investigation, ASU determined that there was "insufficient evidence to substantiate [Avery's] allegation of harassment." (Doc. # 39-23).

Meanwhile, however, Avery had begun falling behind in her training.[4] Defendant ASU claims—and Avery does not dispute—that Avery committed two safety violations involving the misuse of her firearm, to which Avery received corresponding Letters of Counseling; one on April 30, 2013, (Doc. # 39-28); and a second on May 14, 2013, (Doc. # 39-29).

---

[4] Avery admits that "after the sexual harassment thing occurred, and I reported it, I shut down. Because at that point, it was like, everything I did was wrong. And so I just kind of, like, stepped back. And, you know, since they said they wanted to re-train me, I just stepped back and let them do whatever." (Doc. # 39-10, p. 253:6–253:13).

In addition, Officer Wiggins issued Field Training & Evaluation Program Bi-Weekly Report Form(s) ("FTO Reports"), detailing negative reviews of Avery's job performance. On April 23, 2013, Officer Wiggins reported that "Officer Avery Basic, Knowledge and skills as a police officer Needs improvement. She need to take more initiative and have a can do Attitude in learning Departmental [Standard Operating Procedures], policy & procedures, Codes, states Law, Building and location, streets and Highways." (Doc. # 36-25, p. 1).

Then, on May 14, 2013, Officer Wiggins issued a second FTO Report, noting:

> During training and evaluation period of Officer Avery, she don't possess the skills nor does she have the potential as a police officer. Officer Avery is unable to retained the training she has received and learn since assigned to the department. This causes her to make poor judgment in the decision making process. Officer Avery has no knowledge as a police officer or the duties and responsibility and is unable to perform in the field with her fellow officers. Due to Officer Avery poor performance, this will make her a safety risk to herself, superiors, fellow officers, administrators, students, and the local community.

(Doc. 39-26, p. 1).

After her May 14, 2013 FTO Report, Avery complained to Chief Graboys that she was not being adequately trained. (Doc. # 39-30). Avery claimed that she was being "badgered" and "humiliated" by Officer Wiggins. (Doc. # 39-30, p. 2). Specifically, Avery complained about an incident in which Officer Wiggins threatened to fail her on a three-wheeler scooter driving test if she would not drive it, even though she claimed she had never been trained to operate the scooter. When she finally agreed to operate the scooter, Officer Wiggins held up his cell phone, began filming, and laughed at her, stating he was going to place the video on YouTube. (Doc. # 39-30, p. 3). In addition, Avery complained about another incident in which Officer Wiggins allegedly filmed her during an evaluation, which, when Avery noticed she was being filmed, made her cry

and refuse to answer any questions. Avery wrote that she believed she was "being set up for termination." *Id.*

Sometime after May 14, 2013, Avery complained to Chief Graboys that she was suffering from allergies. In response, Chief Graboys moved her from her outside patrol position to work inside, where she was responsible for answering phone calls, dispatching calls, and watching CCTV monitors. (Doc. # 39-37). On May 31, 2013, Avery had her doctor fax a letter to Captain Simmons showing her allergy injections and stating that "[h]er diagnosis and treatment plan should in no way affect her ability to perform her normal daily activities or job duties." (Doc. # 39-10, pp. 230:1–231:22) (Doc. # 39-31). However, when the letter from Avery's doctor which showed that she was able to work outside was received, Chief Graboys did not re-assign her back to an outside patrol position.

It is undisputed that during the entirety of Avery's employment period, she was in violation of a condition for hire requiring that she live within one-hour from campus.

On May 22, 2013, Chief Graboys sent a memorandum to his supervisor, Henry Davis, the Executive Director of Public Safety, recommending Avery's termination. (Doc. # 39-33). In his letter, Chief Graboys cited five (5) factors that contributed to his recommendation: (1) "[d]epite documented and extended training efforts by her supervisors and co-workers, [Avery] continues to be unable to act in an independent manner as an officer; (2) "[Avery] does not have a working retention of the criminal laws that she is expected to uphold;" (3) "Avery is still not able to orient herself around campus to be able to adequately respond to calls for service without the assistance of a senior officer in the vehicle;" (4) "Avery has two documented safety violations in relation to her handling of her assigned firearm;" and (5) "Avery is also in direct violation of a condition for hire specifically established with her by former Chief of Police Thornton, and Department of

8

Public Safety Policy requiring that she re-locate to living within one hour of campus." *Id.*

The next day, on May 23, 2013, Carmen Douglas, ASU's Vice President of Human Resources sent a memorandum to ASU's Executive Vice President, John Knight, and President, William Harris, indicating that Executive Director Davis concurred with Graboys' recommendation to terminate the probationary employment of Avery. (Doc. # 39-35, p. 1). On May 31, 2013, a Friday, President Harris approved the recommendation. *Id.* On June 4, 2013, ASU's Office of Human Resources notified Avery that her employment was terminated. (Doc. # 39-36).

Following her termination, on June 5, 2013, Avery filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC Charge"). (Doc. # 39-37). In her EEOC Charge, Avery complained that she was discriminated against based on sex, retaliation, and disability. As to her sex discrimination claim, she complained that she "was sexually harassed by a fellow co-worker." *Id.* Avery also alleged that she was discriminatorily retaliated against because she "was subjected to yelling and loud talking" by Officer Wiggins. She also reiterated her complaint that "[she] was not properly trained on the operation of the patrol scooter but [she] was told that if [she] could not operate it, [her] employment would be terminated. Officer [Wiggins] pulled out his phone and motioned while making a statement that he was putting [her] scooter training on the internet for viewing; which [she] found offensive." *Id.* As to her disability claim, Avery alleged that "[she] informed the employer that [she] was experiencing problems with [her] allergies and [she] was moved to a desk job. When [she] received information from [her] doctor that [she] could work outside, the employer refused to reassign [her] to outside patrol and subsequently terminated [her] employment." *Id.*

Finally, Avery reiterated, "I believe I am being discriminated against because of my sex,

female and in retaliation for reporting sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I was discriminated against because of my disability in violation of the Americans with Disabilities Act." *Id.*

After conducting an investigation into Avery's Charge, the EEOC issued a Dismissal and Notice of Rights, stating, "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." (Doc. # 39-39).   In addition, the Dismissal and Notice of Rights contained a notice of Avery's right to sue within 90 days of receipt of the notice. *Id.* Accordingly, Avery filed this suit.

## IV.   DISCUSSION

Avery asserts three claims against Defendants ASU and Pettway arising under federal law: sexual harassment and hostile work environment (Count One), retaliation (Count Two) in violation of Title VII of the Civil Rights Act of 1964, as amended, and disability discrimination (Count Three) in violation of the ADA, as amended. In responding to these claims, Defendants also submit that Avery failed to exhaust her administrative remedies before bringing these claims. Because a failure to exhaust administrative remedies under Title VII is a complete bar to suit, the court will address this argument first, and then proceed to the merits of Avery's federal claims.

### D.   Exhaustion

Throughout their initial brief and again in their Reply Brief, Defendants argue that Avery failed to exhaust her administrative remedies with the EEOC as to certain claims. The Eleventh Circuit has made clear that in order to state a claim under Title VII, "a plaintiff must file a charge of discrimination with the EEOC. The purpose of this exhaustion requirement is that the [EEOC]

10

should have the first opportunity to investigate the alleged discriminatory practices to permit its role in obtaining voluntary compliance and promoting conciliation efforts." *See Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (internal citation and quotation omitted).

Specifically, Defendants argue that Avery's "sexual harassment/hostile work environment claim is a new claim" that does not relate to or grow out of the allegations made in her initial EEOC Charge, (Doc. # 39-1, pp. 35–36); "Avery did not exhaust her administrative remedies as it relates to any alleged acts of retaliation committed by Corporal Aldridge," (Doc. # 39-1, p. 54); and that Avery failed to exhaust her administrative remedies with respect to whether she was harassed because of a perceived disability or record of disability or that her reassignment to a desk position constituted discrimination, (Doc. # 39-1, p. 60).

In her Response in Opposition to Defendants' Motion for Summary Judgment, however, Avery failed to rebut the Defendants' exhaustion argument. Defendants then contend in their Reply that Avery effectively conceded the merits of Defendants' exhaustion argument. Defendants cite *Resolution Trust Corp. v. Dunmar Corp.* for the notion that "[i]n opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." 43 F.3d 587, 599 (11th Cir. 1995) (internal citations omitted).

However, while district courts do not bear any burden to distill every conceivable argument a party may make in opposing summary judgment, district courts still maintain an obligation to review the merits of unopposed motions. *See United States v. One Piece of Real*

11

*Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). "[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed. . . . At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment. *Id.*

In this case, while Avery failed to respond to Defendants' exhaustion argument, Defendants included a copy of Avery's EEOC Charge as an Exhibit to their Motion for Summary Judgment. (Doc. # 39-37). Moreover, Avery's EEOC Charge contains allegations for sex discrimination, retaliation, and disability discrimination. Avery's EEOC Charge states the following:

> I am a female who began employment on January 6, 2013, as a police officer with the above referenced employer. I was initially assigned to the second shift where I was sexually harassed by a fellow co-worker. I was moved to the second shift. I was serving a 12-month probationary period. Franklin Wiggins became responsible for my training and during the training period I was subjected to yelling and loud talking to which I found offensive. I was not properly trained on the operation of the patrol scooter but I was told that if I could not operate it, my employment would be terminated. Officer Franklin pulled out his phone and motioned while making a statement that he was putting my scooter training on the internet for viewing; which I found offensive. I filed a complaint against Officer Franklin because I felt the training was not being conducted in a proper manner. As a result, the training ceased on May 14, 2013. Subsequently, I informed the employer that I was experiencing problems with my allergies and I was moved to a desk job. When I received information from my doctor that I could work outside, the employer refused to reassign me to outside patrol and subsequently terminated my employment.
>
> I believe I am being discriminated against because of my sex, female and in retaliation for reporting sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I was discriminated against because of my disability in violation of the Americans with Disabilities Act.

These basically are the claims Avery now presents before this court. Moreover, because the

standard for exhausting administrative remedies is exceedingly forgiving in the Title VII context, the court is reluctant to grant summary judgment in Defendants' favor on exhaustion grounds alone. *See generally Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460–61 (5th Cir. 1970) (noting courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII].") Accordingly, Defendants' Motion for Summary Judgment on the basis that Avery failed to respond to an argument that she failed to exhaust her administrative remedies is due to be denied.

### B.   Sexual Harassment and Hostile Environment Claims (Count One)

Avery claims that she was subjected to sexual harassment and a hostile work environment amounting to gender discrimination under Title VII. (Doc. # 1, pp. 7–10, ¶ 35–53).

To establish a hostile environment claim, the plaintiff must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer was responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Defendants argue that Avery is unable to make this showing because Avery's claims of sexual harassment are neither severe nor pervasive.[5] For harassment to be sufficiently severe or

---

[5] Defendants also argue that they are due summary judgment on the basis that Avery cannot satisfy the fifth prong; that Pettway was Avery's co-worker and not her supervisor. *See* 277 F.3d at 1275. Defendants further state that ASU took prompt remedial action after learning about the harassing incident between Pettway and Avery. *See Miller*, 277 F.3d at 1278. In the alternative, Defendants also argue that, even if Pettway was Avery's supervisor, ASU "exercised reasonable care to prevent and correct the harassment, and [] the plaintiff unreasonably failed to take

pervasive, an employee must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). In analyzing the objective component of these claims, the Supreme Court has held that courts should consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the plaintiff's job performance. *See id.* at 1246. " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to "amount to discriminatory changes in the 'terms and conditions of [a person's] employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Avery's sexual harassment and hostile environment claim is based on comments Pettway made on March 19, 2013. During the course of one working shift, Pettway made eight (8) comments of a sexual nature, two of which were sexual advances directed at Avery. (Doc. # 45, pp. 23–25).[6] Pettway made Avery aware that he had been previously accused of sexual harassment when he worked for the Montgomery Police Department. (Doc. # 39-13, p. 1). Then, after driving

---

advantage of the preventative or corrective opportunities provided." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007). However, because the court can decide Avery's gender discrimination claim under the fourth prong—whether the conduct was sufficiently severe or pervasive as to alter the terms and conditions of employment and create a discriminatorily abusive working environment—the court need not address Defendants' argument with respect to the fifth prong. *See* 277 F.3d at 1275.

[6] Avery argues in her Response that Pettway made one other sexual comment towards her on a different day. Avery alleges that, before she began working at ASU, Pettway "stated to [her] his roommate was moving out and she could move in with him." However, Avery admitted in her deposition that she did not perceive this statement to be sexual in nature, but instead believed it was merely a collegial request because "[Pettway] was under the impression that [Avery] didn't . . . have a place to stay in [Montgomery]." (Doc. 39-10, p. 217:3–217:11). Accordingly, there is nothing in the record to suggest that Pettway made any other sexual comments towards Avery on any day other than March 19, 2013.

past two females, Pettway remarked that "the females looked good and he did not mind getting with them." *Id.* Pettway then pointed to several females walking along the sidewalk and stated, "dam [sic], she's fine, the one with the purple shorts, with the long legs on the outside. I wouldn't mind hooking up with her. The other one don't look bad either." (Doc. # 39-14, p. 1). Pettway also told Avery "about a girl he had sex with, and stated he only wanted sex from her then he dropped her." *Id.* Later in the shift, Pettway pulled out his phone and began scrolling through a list of names saying "he had fucked this one and that one." (Doc. # 39-13, p. 1). Then, while performing a routine building check, Pettway twice asked Avery, "can I fuck you on the couch."

Avery complained about Pettway's comments and was immediately transferred from second shift to first shift, away from Pettway. Despite only running into Pettway twice after being transferred—once at a police department cookout and once at a shift change—Avery was never asked to work alongside Pettway again. Furthermore, Avery has not alleged that Pettway—or anyone else, for that matter—made any other sexual comments towards her or in her presence while she worked at ASU.

The court finds that these comments, while troubling, are not sufficiently severe or pervasive by themselves to constitute a discriminatorily hostile work environment. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (finding insufficient evidence where there was the comment "I'm getting fired up"; the purported harasser rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; made a sniffing sound while looking at the plaintiff's groin,; and there was "constant" following and staring at the plaintiff in a "very obvious fashion."). Merely suffering a barrage of comments during the course of one shift on one day, without more, is not enough to create a hostile work environment.

The evidence presented does not rise to the level of severity recognized by the Eleventh

15

Circuit. *See Guthrie v. Waffle House, Inc.*, 460 Fed.Appx. 803, 805 (11th Cir. 2012 (alleged harassment by a supervisor and a co-worker in the form of "a few dozen comments or actions" spread out over eleven months, which included using crude language, asking the plaintiff on a date 10 to 20 times, kissing the plaintiff on the cheek, grabbing her buttocks two to five times, and putting an arm around her shoulders was not sufficiently objectively severe or pervasive); *compare Husley v. Pride Restaurants, LLC*, 367 F.3d 1238 (11th Cir. 2004) (finding sufficient severity in a male coworker's conduct toward the female plaintiff involving "many direct as well as indirect propositions for sex," including "following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," as well as "enlisting the assistance of others to hold her while he attempted to grope her"). Summary judgment is, therefore, due to be GRANTED as to Count One, her sexual harassment / hostile work environment claim, for failure to establish the fourth element of her claim.

### C.   Retaliation (Count Two)

In Count Two, Avery alleges that ASU unlawfully and discriminatorily retaliated against her because she complained about being sexually harassed by Pettway. (Doc. # 1, pp. 11–12, ¶¶ 54–58).

Title VII prohibits retaliation by an employer because an employee has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *Evans v. Books-A-Million*, 762 F.3d 1288, 1298 (11th Cir. 2014). "The goal of this provision is to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *See Taylor v.*

*Teakdecking Sys., Inc.*, 571 F. App'x 767, 771 (11th Cir. 2014).

"If 'a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant' to produce 'legitimate reasons for the adverse employment action.' . . . If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (quoting *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (internal citations omitted)).

### 1. *Prima Facie* **Case**

Avery alleges in her complaint that she engaged in a statutorily protected activity when she complained about Pettway's sexual comments and that, as a result, she was subjected to as many as eight (8) adverse employment actions, including termination.

Defendants do not dispute that Avery participated in a statutorily protected activity when she complained about Pettway's sexual comments. Moreover, Defendants do not dispute that Avery's termination constitutes an adverse employment action. *See Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 891 (11th Cir. 2015) ("Being fired is, of course, an adverse action."); *Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 894 (11th Cir. 2008) ("Termination is an ultimate employment action that is undeniably adverse."). However, Defendants challenge whether the other seven (7) retaliatory acts that Avery has alleged constitute adverse employment actions.

To demonstrate an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal

citations and quotations omitted). By requiring a showing of material adversity, the Supreme Court preserves the principle that Title VII "does not set forth a general civility code for the American workplace." *Id.* at 68. Furthermore, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Avery claims that in addition to being terminated from her position, she suffered as many as seven (7) other retaliatory acts, including: (1) retaliatory shift change, (2) denial of essential training, (3) removal from position, (4) threats of termination, (5) unjust discipline, (6) assignment of more difficult tasks, and (7) harassment. (Doc. # 1, p. 11, ¶ 55). However, the court concludes that Avery has failed to demonstrate that a reasonable employee would find any of these actions materially adverse.

First, Avery alleges that her shift was changed in retaliation for her complaining about Pettway's sexual comments. (Doc. # 1, p. 11, ¶ 55). When asked to clarify in her deposition how her shift change was allegedly adverse, Avery testified that she was shunned and that the atmosphere was completely different. However, the Eleventh Circuit has found that "[m]ere ostracism in the workplace is not grounds for a retaliation claim." *Terrell v. Paulding Cty.*, 539 Fed.Appx. 929, 934 (11th Cir. 2013) (citing *Manatt v. Bank of Am.*, 339 F.3d 792, 803 (9th Cir. 2003). Accordingly, Avery has not presented any evidence to show how a shift change would dissuade a reasonable person from coming forward and making a sexual harassment complaint.

Additionally, Avery admitted in her affidavit to ASU's Office of Human Resources that she was satisfied with these changes to her schedule. (Doc. # 39-13, p. 2). Moreover, Avery's argument that it was Chief Graboys' decision to place Avery on another shift and to work under the training of Officer Wiggins and that this was all a part of a pattern of actions taken to retaliate

18

against Ms. Avery is also not in accord with the evidence. According to her own testimony during her deposition, it was Avery—and not Chief Graboys—who recommended that she train under Officer Wiggins. Further, like her satisfaction in a shift change, she was also satisfied with her new training officer, whom she requested. (Doc. # 39-13); (Doc. # 39-10, p. 251:3–251:6). These facts weigh against a finding that her shift change would dissuade a reasonable person from complaining about sexual harassment.

Second, Avery alleges that she was denied essential training. (Doc. # 1, p. 11, ¶ 55). However, Avery does not present any evidence showing that she was denied any essential training nor does she cite to anything in her brief showing the absence of any training that would have ordinarily been given to other similarly situated employees. When asked whether "there was some training that [she] needed at ASU that [her] supervisors did not give to [her]," she answered, "No." (Doc. # 37-10, p. 253:3–253:6). Later, when she was re-asked whether she was denied any essential training, she responded, "Well, I had been trained on all the zones, except for the last zone that he was training me on . . . And I think that was the zone that we were working in when I got terminated." (Doc. # 37-10, p. 254:6–254:14). While it is certainly possible that being denied essential training could dissuade a reasonable person from engaging in a statutorily protected activity, there is no evidence to show that Avery was actually denied training. Avery's argument appears to be solely based upon her unsupported allegation that she was denied essential training. Therefore, the court declines to find that Defendants conduct constitutes an adverse employment action.

Third, Avery alleges that she was removed from her position. (Doc. # 1, p. 11, ¶ 55). When asked this allegation, Avery clarified that she was referring to being placed on temporary desk duty. (Doc. # 37-10, p. 256:4–256:21). However, the Eleventh Circuit has found that mere

reassignment, without more, is insufficient to dissuade a reasonable person from engaging in a protected activity. *See, e.g.*, *Gibbs-Matthews v. Fulton Cty. Sch. Dist.*, 429 F. App'x 892, 894 (11th Cir. 2011) ("We find no reversible error in the district court's grant of summary judgment on Gibbs–Matthews's retaliation claims based on the denial of a promotion or her reassignment to an allegedly temporary position.") Avery has not alleged that her reassignment was accompanied by a corresponding loss in pay, prestige, or any other benefit associated with outside work at ASU. Accordingly, the court cannot say that her alleged transfer to an open desk job constituted an adverse employment action.

Fourth, Avery alleges that she was threatened with termination. (Doc. # 1, p. 11, ¶ 55). This, too, is missing from the evidence. Avery fails to support her claim that she suffered threats of termination by direct evidence in the record. Additionally, when asked in her deposition about these alleged threats, Avery responded that "[Corporal Aldridge] said that [she] didn't know the job, and [she], as a police officer already, [she] should know the job duties as a police officer." (Doc. # 37-10, p. 254:15–255:8). The court finds that these statements are not threats but rather merely the sort of day-to-day "petty slights" or "minor annoyances" any employee might experience on the job. And, "normally petty slights, minor annoyances, and simple lack of good manners" would not dissuade a reasonable employee from making or supporting a charge of sexual harassment. *Burlington*, 548 U.S. at 68.

Fifth, Avery alleges that she was subjected to unjust discipline. (Doc. # 1, p. 11, ¶ 55). When asked about the alleged discipline she received, Avery complained that she was "constantly being yelled at. And after [she] filed a complaint, it was, like nothing I did was correct – was correct." (Doc. # 37-10, p. 255:9–255:15). However, like being told that she should know how to do her job by now, as alleged above in her "threats of termination" allegation, this, too, seems like

the sort of petty slights that employees experience on the job. *Burlington*, 548 U.S. at 68. Accordingly, these comments do not give rise to a claim for retaliation because they do not amount to an adverse employment action.

Sixth, Avery alleges that she was assigned more difficult tasks. (Doc. # 1, p. 11, ¶ 55). Although Avery makes no mention of these alleged difficult tasks in her brief, Avery testified in her deposition that she "was doing *stuff* that nobody else would do." (Doc. # 37-10, p. 255:18–21) (emphasis added). Avery did not clarify exactly what kind of "stuff" she was referring to, or support her claim with any other evidence that she was actually assigned more or more difficult tasks than anyone else similarly situated at ASU. Without more, the court is left to find this allegation baseless and unsupported by the evidence.

Seventh, Avery alleges, generally, that she was harassed. (Doc. # 1, p. 11, ¶ 55). In her deposition, Avery expounded that she was referring to being Officer Wiggins constantly "grilling [her]" and being required to "stand outside in the hot heat" during training. Defendants argue that this testimony shows Avery's annoyance with her training protocol. The court agrees. The court does not sit as a super-personnel board and, as such, it will not endeavor to comment on the merits of ASU's training regimen. That ASU questioned Avery outside while on patrol is no more evidence of an adverse employment action than being required to show up for work in the first place. Moreover, the Eleventh Circuit has held that routine job monitoring and supervision is not evidence of an adverse employment action. *See Archibald v. United Parcel Serv. Co. Inc.*, 620 F. App'x 836, 838–39 (11th Cir. 2015) ("That Archibald was observed on his driving route ten times during one year, received warnings and a one-day suspension for his violations of company appearance rules, and received nighttime telephone calls to inform him of temporary driving assignments amounted to mere annoyances and did not affect his position with UPS.")

Accordingly, the court does not find Avery's allegation of harassment to constitute an adverse employment action.

However, assuming that the other alleged actions as a whole could be considered adverse employment actions, because, as mentioned previously, Avery has established that she suffered an adverse employment action when she was terminated from her position, and Defendants do not otherwise dispute any other element of Avery's *prima facie* case, Avery has met her burden with respect to establishing a *prima facie* case of retaliation, and Defendants are not due summary judgment on this basis.

### 2.   Legitimate, Nondiscriminatory Reason

Assuming that Plaintiff has shown a *prima facie* case, Defendants argue that ASU had legitimate, nondiscriminatory reasons for Avery's termination.

Defendants cite four legitimate, nondiscriminatory reasons for Avery's termination: (1) "She does not have a working retention of the criminal laws that she is expected to uphold;" (2) "Officer Avery is still not able to orient herself around campus to be able to adequately response to calls for service without the assistance of a senior officer in a vehicle;" (3) "Officer Avery has two documented safety violations in relation to her handling of her assigned firearm;" and (4) "Officer Avery is also in direct violation of a condition for hire . . . that she re-locate to living within one hour of campus." (Doc. # 39-1, p. 49). These reasons are sufficient to meet the Defendants' burden of proffering a legitimate, nondiscriminatory reason for Avery's termination. *See, e.g.*, *Chapman v. Al Transport*, 229 F.3d 1012, 1033–37 (11th Cir. 2000) (poor performance sufficient nondiscriminatory reason).

### 3.   Pretext

Avery responds, however, that the Defendants' proffered reasons are pretextual and, thus,

summary judgment should be denied.

At this stage, the court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on Defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994); *see also Burdine*, 450 U.S. at 254–256. To this end, "[t]he plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a fact finder to conclude that the reasons given by the employer were not real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997).

A plaintiff may accomplish this goal by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence" or by directly persuading the district court that discrimination was the true reason behind the challenged action. *Combs*, 106 F.3d at 1539 (citation omitted). Further, the Eleventh Circuit has made clear that the plaintiff must do so as to each of the legitimate, nondiscriminatory reasons proffered by the Defendants. *Chapman*, 229 F.3d at 1024–25. Otherwise, the employer is entitled to summary judgment on the plaintiff's claim. *Id.*

In this case, Avery argues that the reasons proffered by Defendants are inconsistent with and contradictory to the reasons Defendants stated in their brief. Avery claims that Defendants argue in their brief that Avery was fired because "(1) she did not have a working retention of criminal laws, (2) she was not able to orient herself around the campus, (3) she had two documented safety violations, and (4) she did not relocate into the district." (Doc. # 45, p. 14). Yet,

23

Avery shows that when asked why Avery was fired, Chief Graboys testified at his deposition that he "was asking for her termination because of the safety violations." *Id.* (citing (Doc. # 39-3, pp. 93:22–94:03). Avery also states that Chief Graboys's action—or, rather inaction—in response to Avery's alleged safety violations indicate that Avery's safety violations could not have had anything to do with her termination.

While it is true that inconsistencies and contradictions can be evidence of pretext, *see Bechtel Construction Co. v. Secr. Of Labor*, 50 F.3d 926 (11th Cir. 1995), the reason Chief Graboys offered in his deposition for Avery's termination is not inconsistent with or contradictory to the reasons he offered in his recommendation for Avery's termination.[7] (Doc. # 39-33). In his recommendation, Chief Graboys cited four reasons for Avery to be terminated, one of which was her two safety violations. Even if his failure to mention three out of the four reasons he initially cited for her discharge in his recommendation for Avery's termination were inconsistent with the reasons he offered in his deposition, that Chief Graboys testified in his deposition about Avery's safety violations is consistent with the fact that he mentioned Avery's safety violations in his recommendation for Avery's termination. *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998) (noting "the existence of a possible additional non-discriminatory basis for [plaintiff's] termination does not, however, prove pretext").

In addition to Avery's claim that Defendants offered inconsistent or contradictory reasons for Avery's termination, Avery argues that her termination after only one prior verbal warning marks a departure from ASU's disciplinary guidelines requiring that she receive at least three (3) prior warnings before seeking termination. Avery claims that this departure from their official

---

[7] The court looks to the record evidence, and not the Defendants' brief, to determine inconsistencies and contradictions between a witness's prior statements concerning discriminatory retaliation.

policy is evidence of pretext, citing two Eleventh Circuit decisions that found an employer's deviation from standard policies to evidence pretext. *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *Morrison v. Booth*, 763 F.2d 1366 (11th Cir. 1985). Avery cites to ASU's HR Manual which shows a disciplinary guideline table recommending certain types of disciplinary action for certain types of offenses, including: for the first offense, a reprimand; for the second offense, suspension; for the third offense, suspension; and for the fourth offense, termination. (Doc. # 44-8, pp. 51–53).

However, the HR Manual directly contradicts Avery's claim. Avery was a probationary status employee because she was still within the first year of her employment with ASU. (Doc. # 39-6, p. 9). Section 2.5.2 states, "[t]he University reserves the right to terminate the employment of a probationary employee at any time during or at the end of the probationary period," (Doc. # 44-8, p. 26). Accordingly, the HR Manual gives no procedural guarantees of prior verbal warnings for probationary employees. *Id.*

Moreover, Defendants cite Section 2.6, which refers to the disciplinary procedures in Section 6.0—cited by Avery—which further provides, "[s]ubsequent to the satisfactory completion of the prescribed probationary employment, the employee shall gain the right to classified employment status at that level and may not be dismissed except through due process procedures set forth in Section 6.0 of this manual." Therefore, Section 2.6 at least implicitly contemplates that probationary employees are not guaranteed the same measure of due process as that of ordinary employees under Section 6.0 of the HR Manual. Thus, even if Avery was fired after only one verbal warning, it was not a deviation from ASU's disciplinary guidelines towards ordinary employees to do so because she was a probationary employee.

Finally, Avery argues ASU's efforts to "build a case" against Avery evidences pretext.

25

(Doc. # 45, p. 16). Specifically, Avery states that "[p]rior to . . . raising complaints of sexual harassment, she had not received any type of discipline and there were no documented problems with her performance." *Id.* Then, after filing her sexual harassment complaint against Pettway, "a file was created containing her sexual harassment complaint and daily typed reports about her performance." *Id.* Thus, Avery submits, ASU's increased scrutiny of her work performance, where before making her complaint there had been none, gives rise to a reasonable inference of pretext.

However, this too is belied by the evidence. Avery admits in her March 22, 2013 Affidavit that on the first day of work, she "was reported to Corporal Davis that [she] didn't know the campus and [she] would be a liability because [she] wouldn't be able to assist by arriving to the areas if needed." (Doc. # 39-15, p. 1). Then again, approximately four weeks later, her supervisor, Corporal Davis "began constantly stating [that she] should know this campus by now[.] [I]t shouldn't take you that long to get to these areas." (Doc. # 39-15, p. 2). Further, on March 19, 2013, just three days before she filed her sexual harassment complaint, Avery claimed to be ridiculed by Corporal Davis in front of the other officers when he "made a statement out loud stating that if you haven't learned this by now [you're] slow." (Doc. # 39-15, p. 3). Thus, Avery's argument that her pristine employment record was somehow subject to ridicule and tarnish only after filing a sexual harassment complaint is not in accord with the facts.[8]

Accordingly, Avery does not sufficiently show any of Defendants' proffered reasons were pretextual. So long as one nondiscriminatory reason remains, Avery has failed to successfully establish pretext. *See Chapman*, 229 F.3d at 1024–25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant

---

[8] Avery also argues that the fact that a "boot" was placed on her vehicle during her deposition is further evidence of pretext. However, Avery cites not authority for and the court does not find this after-the-fact evidence to be relevant to her retaliation claim.

employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.") Here, all reasons remain, and, in fact, the plaintiff does not dispute one of the reasons, i.e., that she never relocated as required. Therefore, under the *McDonnell-Douglas-Burdine* framework, summary judgment on Avery's unlawful retaliation claim is appropriate, and the Defendants' Motion for Summary Judgment in that regard is due to be GRANTED.

### D.   Discrimination Pursuant to the ADA and ADAA (Count Three)

Finally, Avery alleges that she "has been discriminated against on the basis of her disability, and/or on the basis of Defendant's perception that Plaintiff had a disability and/or due to Defendant having a record of Plaintiff's disability." (Doc. # 1, pp. 12–14, ¶ 59–62).

The ADA proscribes discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability. *See Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000).

### 1.   *Prima Facie* Case

Defendants submit that Avery cannot establish her *prima facie* case of disability discrimination because she does not suffer from a disability. Congress defined "disability" in the ADA as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. 12102(1). Avery alleges that her allergy diagnosis is sufficient to

27

constitute a disability under either (1) or (3).

First, Avery argues that her allergies substantially limited a major life activity, because they "limit her ability to breathe, and require her to carry an EpiPen on the days she received treatment due to the risk of a life threatening allergic reaction." (Doc. # 45, p. 20). Although breathing is certainly a major life activity, Avery has not presented any evidence to create a genuine issue of material fact that her allergies "substantially limited" her ability to breathe.

The EEOC defines "substantially limits" as being "unable to perform a major life activity" or "significantly restricted as to the condition, manner or duration" in which she performs a major life activity. 29 C.F.R. § 1630.2(j)(1)(i)–(ii). Further, as the Middle District of Georgia explained in *Watson v. Hughston Sports Medicine Hospital*, "[w]hether an individual's ability to perform a major life activity is 'substantially limited' is to be determined by examining three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or expected such impact, of or resulting from the impairment." 231 F.Supp.2d 1344, 1349 (M.D. Ga. 2002) (citing 29 C.F.R. § 1630.2(j)(2)).

The only evidence of Avery's allergies directly contradicts her claim that her allergies substantially limited her ability to breath. (Doc. 39-31, p. 2). After complaining about her allergies and being reassigned to work inside, (Doc. # 39-10, pp. 230:1–231:22), Avery submitted a note from her doctor to Captain Simmons. (Doc. # 39-37). In the doctor's note, Dr. Lake of the Tuscaloosa Ear, Nose & Throat Allergy Clinic, specifically notes that, although Avery had been "diagnosed with inhalant allergies," "[h]er diagnosis and treatment plan should in no way affect her ability to perform her normal daily activities or job duties," including breathing. (Doc. 39-31, p. 2). Avery does not submit any evidence to dispute the validity of Dr. Lake's assessment of her allergies or their effect on her ability to breathe or work, nor does Avery dispute Defendants'

28

argument regarding the severity of her allergy diagnosis. Accordingly, because Avery has not submitted any evidence to support her claim that her allergies substantially limited her ability to perform a major life activity, the court does not find that her allergies qualified as a disability under the first prong of the ADA's definition of a disability. *See* 42 U.S.C. 12102(1).

In the alternative, Avery argues that her allergies constitute a disability because ASU regarded her as having a physical impairment that substantially limited a major life activity. Avery states that "[ASU] did not allow her to perform the duties of a police officer, but rather, had her perform the duties of a civilian position. This evidence shows that ASU felt Ms. Avery's allergies limited her ability to work as a police officer and regarded her as disabled." (Doc. # 45, p. 20). The court disagrees.

Being assigned to perform the duties of a civilian post as opposed to being assigned to perform the duties of a police officer does not, by itself, show that Defendants regarded her allergies as limiting her ability to perform the duties of a police officer. Instead, as Defendants state, ASU merely accommodated Avery for her allergies after she complained of them. (Doc. # 39-1, p. 57). This was nothing more than characteristic employer compassion for an ailing employee.

Furthermore, put into context, the fact that Avery was kept at her desk position even after she presented a doctor's note showing that she was able to work outside does not evidence that Defendants regarded her allergies as a substantially limiting impairment. Instead, the record shows that on May 22, 2013—nine (9) days before Avery submitted a doctor's note to Captain Simmons regarding her allergies—Chief Graboys sent a memorandum to his supervisor, Henry Davis, recommending Avery's termination. Moreover, Graboys' recommendation was approved by President Harris on May 31, 2013. Accordingly, it is more likely that, rather than being kept at her

desk position because ASU regarded her as suffering from a disability, Avery was kept at her desk position at that time because her termination was already in the works. The letter was faxed to ASU on Friday, the same day that the President approved Avery's termination, and Avery was advised of the termination the following Tuesday.

Accordingly, the court finds that no reasonable juror could conclude that Avery's allergies substantially limited her ability to breathe or that ASU regarded her as having such an impairment. Because Avery has not established that she suffered from a disability, as that term is defined under the ADA, Avery cannot establish her *prima facie* case under the ADA. Defendants' Motion for Summary Judgment as to Avery's ADA claim is due to be GRANTED.

## V.   CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. Avery's state law claims in Counts Four, Five, and Six are DISMISSED WITH PREJUDICE.

2. Defendants' Motion for Summary Judgment, (Doc. # 39), as to Counts One, Two, and Three of Avery's Complaint is GRANTED.

3. Final judgment will be entered accordingly, with costs taxed against the plaintiff.

Done this 13th day of December, 2016.

                   /s/ W. Harold Albritton
                   W. HAROLD ALBRITTON
                   SENIOR UNITED STATES DISTRICT JUDGE